## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

—————————————————————————
                                              )
**UNITED STATES OF AMERICA**                  )
                                              )
         **v.**                               )    **Criminal No. 2016-0009-03**
                                              )
**JOSE R. HODGE, et al.,**                    )
                                              )
              **Defendants.**                 )
—————————————————————————)

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
  *For the United States*

**Renee D. Dowling, Esq.,**
St. Croix, U.S.V.I.
  *For Defendant Jose R. Hodge*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

  THIS MATTER comes before the Court on the "Motion to Suppress Statements and Physical Evidence" (Dkt. No. 180) filed by Defendant Jose Hodge ("Defendant" or "Defendant Hodge") and the Government's "Opposition to Hodge's Motion to Suppress Statements and Physical Evidence" (Dkt. No. 254). For the reasons discussed below, the Court will deny the Motion to Suppress.

## I.  BACKGROUND AND EVIDENCE[1]

  On August 24, 2016, the United States (the "Government") filed a First Redacted Superseding Indictment (the "Indictment") against Defendant and fourteen other co-defendants.

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Hodge is presumed innocent until proven guilty. Most of the

The Indictment states that co-defendants Quinones-Davila, Gutierrez-Calderon, and Defendant Hodge "were the main leaders of a drug trafficking organization that operated in Florida, Puerto Rico, St. Croix and other parts of the Caribbean." (Dkt. No. 181-1 at 2). According to the Indictment, "[Defendant] Hodge made drug transportation and security arrangements regarding activities on St. Croix. He facilitated the pickup and housing of transporters and couriers who traveled from Puerto Rico to St. Croix." (*Id.* at 3). As against Defendant Hodge, the Indictment brings the following five counts: (1) Conspiracy to Possess Controlled Substance with Intent to Distribute (Count 1); (2) Bulk Cash Smuggling (Count 2); (3) Attempted Possession of Cocaine with Intent to Distribute (Counts 3 and 5); (4) and Possession of Cocaine with Intent to Distribute (Count 7).

On August 22, 2016, Defendant filed the instant Motion seeking to suppress all physical evidence obtained as a result of "an illegal stop, search and seizure of [Defendant,] and any statements he made while in police custody on November 14, and 16, 2015." (Dkt. No. 180 at 1). The Government filed its Opposition on September 9, 2016, in which it argued that none of the evidence was subject to suppression. (Dkt. No. 254). A suppression hearing was held on September 16, 2016, at which the Government called four witnesses to testify and admitted three exhibits into evidence. After the conclusion of the suppression hearing, the Court issued an Order requiring the parties to submit supplemental briefing. (Dkt. No. 315). Pursuant to this Order, on September 30, 2016, the Government filed its "Supplemental Response to Jose Hodge's Motion to Suppress Statements and Physical Evidence" (Dkt. No. 343), and Defendant filed his "Post Suppression Hearing Brief" (Dkt. No. 344). On October 2, 2016, the Government filed its "Response to Jose

---

facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

Hodge's Post Suppression Hearing Brief" (Dkt. No. 345), and Defendant filed his "Reply to Government's Supplemental Response to Jose Hodge's Motion to Suppress Statements and Physical Evidence" on October 11, 2016 (Dkt. No. 368).[2]

At the suppression hearing, the following facts emerged. In early November 2015, DEA agents on St. Croix were investigating an expected shipment of drugs into St. Croix via boat. The DEA officials knew that the drug trafficking organization ("DTO") behind the suspected November 2015 operation smuggled drugs into St. Croix by using mid-sea transfers. Specifically, a boat would leave St. Croix and travel south approximately 80-100 miles where it would obtain drugs from a Venezuelan supply vessel. After collecting the drugs at sea, the boat would then return to St. Croix. The DEA had been investigating the DTO for approximately one-and-a-half years. During the period of the DEA's investigation, a confidential source ("CS") was serving as a boat captain for the DTO.

On November 6, 2015, the CS informed Officer Aldemar Santos that he had received a call from co-Defendant Sergio-Quinones asking the CS if the boat that the CS owned was operational. The next day on November 7, the CS received a call from co-Defendant Jean-Cruz, in which he told the CS that he was on St. Croix and that he needed to be picked up. However, co-Defendant Jean-Cruz later called the CS back telling him that he had already received a ride from Defendant Hodge. Later, the CS informed Officer Santos that he had met with everybody and had learned that co-Defendant Jean-Cruz and others were on St. Croix to effectuate a shipment of 80 kilograms of cocaine for co-Defendant Sergio-Quinones. The plan was for the CS, along with co-Defendant Jean-Cruz and co-Defendant Anibal Vega-Arizmendi, to go out to sea using the CS's boat, pick

---

[2] To correct a CM/ECF filing error, Defendant refiled his "Reply to Government's Supplemental Response to Jose Hodge's Motion to Suppress Statements and Physical Evidence" on October 12, 2016. (Dkt. No. 372).

up the cocaine from a supply vessel, and bring it back to St. Croix. They were to drop the cocaine off at a beach called Negro Bay where Defendant Hodge, a third person, and co-Defendant Juan Pacheco would be waiting to see the drugs and take them to a stash house. The job was originally planned for November 8, but the CS later contacted Officer Santos and informed him that the job was being pushed back to November 9. On November 9, Officer Santos received another call from the CS saying that they were heading out to sea to pick up the drugs. Officer Santos and others established surveillance and observed the CS's boat heading out to sea. However, later on November 9, Officer Santos received a call from the CS informing him that the seas were too rough and that they had to turn back to St. Croix.

The following day on November 10, the CS informed Officer Santos that co-Defendant Santiago-Colon had been brought in to run the CS's boat and that they had gone out to sea earlier that morning. The CS also stated that the boat was returning to St. Croix because it was not running well and the sea was rough. Officer Santos and others established surveillance in the area where the boat was to return, and Officer Santos observed co-Defendant Santiago-Colon and others returning in the boat.

On the morning of November 11, Officer Santos met with the CS. The CS informed him that they had gotten another boat for the job and that the CS needed to meet with Defendant Hodge to give him suitcases that were left on the CS's boat and also to provide Defendant Hodge with additional fuel tanks. The plan was to make another attempt to pick up the cocaine on November 11. Surveillance was established, and officers saw co-Defendant Santiago-Colon and two others launching a green boat. Air surveillance was then established on the boat, but the boat turned around and headed back to St. Croix before obtaining the cocaine.

4

On November 12, Defendant Hodge instructed the CS to again get his boat ready. The CS informed Agent Santos that Defendant Hodge, co-Defendant Gamalier Rohlsen-Arizmendi, and the CS would be meeting on the morning of November 13 in the McDonald's parking lot. Surveillance was established and officers observed Defendant Hodge, co-Defendant Gamalier Rohlsen-Arizmendi, and the CS together in the McDonald's parking lot. After the meeting at McDonald's, the CS informed Officer Santos that he would be leaving later that day with his boat to meet with co-Defendant Rohlsen-Arizmendi and co-Defendant Santiago-Colon on the east end of St. Croix.

The CS departed later that day in his boat and the officers began surveilling the east end of St. Croix. Earlier, officers had installed a GPS tracking device on the CS's boat. Officer Santos was able to observe the CS on his boat near a beach on the east end of St. Croix, but lost visual contact. Officer Santos later saw the CS's boat heading east being operated by co-Defendant Santiago-Colon, co-Defendant Rohlsen-Arizmendi, and a third individual whom he did not recognize. Based on the boat's location relative to St. Croix, heading east was the shortest route to travel south of the island. The officers coordinated with the U.S. Coast Guard to provide air surveillance. Around 9:30 p.m., air surveillance informed the officers that they had observed two boats near each other, and that one of the boats was about 60 nautical miles south of St. Croix traveling northward back to St. Croix. Agent Santos testified that—based on his knowledge gained from the investigation of the DTO—this information indicated that the transfer of drugs had occurred and that the boat heading back to St. Croix was carrying drugs.

Based on information received from the CS, the officers had set up surveillance around a particular beach on the south shore of St. Croix in an attempt to intercept the drugs when the boat reached St. Croix. However, when the boat got close to St. Croix in the early morning of November

14, air surveillance lost contact with it. While the boat also had a tracking device attached to it, the tracking device was not functioning properly. Once the officers lost contact with the boat, they began fanning out along St. Croix's southern shore. Shortly thereafter, the tracker began functioning properly again and indicated that the boat was on the east end of St. Croix heading north. Accordingly, officers began heading toward beaches on the northeast portion of St. Croix. About this time, the tracker indicated that the boat was between Knight's Bay (locally known as Smuggler's Cove) and Cramer's Park. With this information, some officers (including Officer Santos) went to Cramer's Park, and other officers (including Lieutenant Elskoe and Officer Fritz) went to Knight's Bay.

Lieutenant Elskoe testified that he and Officer Fritz drove to Smuggler's Cove in an attempt to intercept the shipment of drugs. Lieutenant Elskoe testified that when he and Officer Fritz reached the parking area of Smuggler's Cove, he observed Defendant Hodge sitting inside a van by himself. Although it was dark, Lieutenant Elskoe stated that he could see Defendant because of the officers' headlights and because the van's dome light was on. Lieutenant Elskoe "immediately" knew it was Defendant Hodge because he had been aware of Defendant Hodge and his involvement in drug trafficking for six years; had taken photographs of Defendant Hodge; and knew that Defendant Hodge had been identified as being involved with this particular drug trafficking transaction. Once Lieutenant Elskoe saw Defendant Hodge, Lieutenant Elskoe and Officer Fritz approached Defendant Hodge's van, ordered him out of the van, and Officer Fritz placed him in handcuffs. Lieutenant Elskoe testified that they detained Defendant Hodge because "we believed him to be part of the current transaction in which drugs were coming to St. Croix."[3]

---

[3] Lieutenant Elskoe also testified that there were no other vehicles in the immediate vicinity, no other people in the van besides Defendant Hodge, no other people around the van or swimming or camping at the beach. Given the early morning hour and the surrounding circumstances, Lieutenant

At some point after Defendant was handcuffed, Agent Fritz told him "this looks like a bad day for you," and Defendant responded, "and it looks like it's a good day for you."

After Defendant Hodge was handcuffed, Officer Santos arrived at the beach. Activity was detected on the beach and Lieutenant Elskoe and Officer Santos went to investigate. The officers discovered three individuals on the beach standing next to suitcases. When Officer Santos yelled "police" in Spanish, two of the three individuals took off running. The individual who stayed (co-Defendant Rohlsen-Arizmendi) tossed something away, took out a flip-phone, broke it, and threw it behind him. Officer Santos handcuffed co-Defendant Rohlsen-Arizmendi; another officer was able to locate and detain one of the other individuals who ran away; and four suitcases were discovered nearby. Officer Santos opened one of the four suitcases and discovered what he believed to be several bricks of cocaine. This belief was based both on the information Officer Santos learned from the CS about what the DTO would be picking up that night and his experience with drug trafficking and how cocaine is usually packaged. The officers confiscated all of the suitcases and arrested the three individuals (including Defendant Hodge) who had been detained.

In the morning, the officers went back to the beach and found a satellite phone in the water. They also found a satellite phone near where Defendant Hodge had been initially detained. The satellite phone did not have a battery in it, but a battery was found about three-to-four feet away from the phone.

After Defendant Hodge was arrested in the early morning of November 14, he was transported to the HIDTA office on St. Croix. Within 30-45 minutes after arriving at the HIDTA office, he was interviewed by Agent Latchmen, Tracey Gardner, and Sara Bourne. At the

---

Elskoe testified that he found it unusual that Defendant Hodge was sitting in a van at the beach by himself.

beginning of the interview, Agent Latchmen advised Defendant of his right to have the interview recorded by video or by audio. Defendant declined to have the interview recorded and signed a declaration form indicating the same.

Agent Latchmen then advised Defendant Hodge of his *Miranda* rights by presenting him with an Advice of Rights form containing the *Miranda* rights.[4] Agent Latchmen advised Defendant that he was under arrest and asked whether he wanted to read the rights presented on the form himself or if he wanted Agent Latchmen to read him the rights. Defendant indicated that he wanted Agent Latchmen to read the rights to him. Agent Latchmen then read through each of Defendant's *Miranda* rights on the form verbatim; asked Defendant if he understood the rights; and Defendant responded in the affirmative. Defendant also checked the box on the Advice of Rights form indicating that someone had read to him his rights and he signed the form underneath the paragraph which states: "someone has read to me this advice of rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer questions without a lawyer present." (Govt. Exh. 2). Agent Gardner testified that while Agent Latchmen was reading the *Miranda* rights to Defendant, Defendant was looking at Agent Latchmen and appeared to be listening.

The interview took place in a room with a table in which Defendant was sitting across from Agent Latchmen. The room was a conference room that had several windows, a bathroom connected to it, and one exit. Defendant did not request food or water, but there was water and coffee available, and at one-point Defendant was offered a drink. Agent Latchmen testified that

---

[4] The Advice of Rights form lists the following rights: "You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish." (Govt. Exh. 2).

the interview was conducted in a conversational tone of voice, and that Defendant never asked to stop the interview or asked to have an attorney present. The interview lasted about 30-45 minutes.

Defendant was in handcuffs during the interview, and Agent Latchmen testified that he was armed. Agent Gardner testified that no guns were drawn during the interview and that she was "99% sure" that she was not armed. Agent Latchmen testified that Defendant appeared relaxed, and was matter-of-fact and short with his answers. Agent Gardner testified that during the interview Defendant appeared to be "very calm" and "very cooperative." Defendant's answers related directly to Agent Latchmen's questions. Agent Latchmen testified that during the interview, there was nothing that Defendant said or that occurred that made him doubt that Defendant understood English or that he was understanding Agent Latchmen's questions. Agent Latchmen later prepared a report regarding what was said in the November 14 interview. (Govt. Exh. 3).

Officer Santos testified that on November 16, 2015, he sat in on another interview with Defendant Hodge. Although he initially went to the interview to see if they needed assistance translating, Officer Santos testified that once he arrived, he observed that Defendant Hodge did not need translation assistance—even though the interview was in English. Officer Santos observed Defendant speaking in English during the interview. Officer Santos further testified that during the course of the investigation, he listened to recordings of phone conversations between the CS and Defendant, and that the conversations were in English. Officer Santos also testified that prior to Defendant's arrest, he had spoken with him at Defendant's house. During the conversation, Defendant spoke mostly in English with some Spanish included.

Agent Latchmen testified that about 8-12 months prior to Defendant Hodge's arrest, he was involved in a traffic stop in which Defendant was the passenger of the stopped vehicle. During

the stop, Agent Latchmen had a conversation with Defendant and the vehicle's driver regarding their activities that night and the use of a boat that the stopped vehicle was towing. Agent Latchmen testified that the conversation was in English and that Defendant appeared to understand the conversation.

## II.      DISCUSSION

### A.      Defendant's Detention on the Beach

Defendant argues that his initial seizure on the beach was illegal because "the agents did not have particularized information about [him] to establish reasonable suspicion or probable cause." (Dkt. No. 180 at 3-5). Defendant further argues that his "involuntary detention . . . exceeded the limited restraint permitted by *Terry v. Ohio*. (Dkt. No. 372 at 3). The Government argues that there was sufficient reasonable suspicion to detain Defendant when Agent Fitz and Lieutenant Elskoe encountered him on the beach sitting in a vehicle; that Defendant's detention was "sufficiently limited in scope and duration" to be a lawful investigatory seizure; and that Defendant's resulting arrest was supported by probable cause once the officers discovered the cocaine. (Dkt. No. 343 at 1-2; Dkt. No. 254 at 6). The Court finds that Defendant's initial seizure was a permissible *Terry* stop supported by reasonable suspicion and that once the cocaine was discovered, the officers had probable cause to justify his subsequent arrest.

### 1.      Applicable Legal Standards

The initial step of any Fourth Amendment seizure analysis is "to determine whether a seizure took place and, if so, when the seizure occurred." *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)). The Supreme Court has articulated that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the

circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (stating that "[a] seizure occurs whenever an officer restrains the freedom of a person to walk away") (internal citation and quotations omitted).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court established the principle that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (quotations omitted). The constitutionality of a *Terry* stop involves a two-part assessment:

> First, we examine "whether the officer's action was justified at its inception"—that is, whether the stop was supported by reasonable suspicion at the outset. . . . Next, we determine whether the manner in which the stop was conducted "was reasonably related in scope to the circumstances which justified the interference in the first place."

*United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 19-20). It is well established that "[r]easonable suspicion is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Because "probable cause means 'a fair probability that contraband or evidence of a crime will be found,' the level of suspicion necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content from that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330).

"A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). However, the police officer must demonstrate that the stop was based on something more than an "inchoate and

unparticularized suspicion or hunch." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27) (quotations omitted). "Reasonable suspicion is an 'elusive concept,' but it unequivocally means that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "An officer cannot conduct a *Terry* stop simply because criminal activity is afoot. Instead, the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity." *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) (internal citation omitted). In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *Cortez*, 449 U.S. at 417).

"When a *Terry* stop is based on a tip provided by an informant, [courts] must scrutinize the informant's 'veracity, reliability, and basis of knowledge' to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop." *Johnson*, 592 F.3d at 449 (quoting *Torres*, 534 F.3d at 210). In particular, courts examine whether:

> (1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility;
> (2) the informant can be held responsible if her allegations are untrue;
> (3) the information would not be available to the ordinary observer;
> (4) the informant has recently witnessed the criminal activity at issue; and
> (5) the witness's information accurately predicts future activity.

*Id.* However, the above factors are not applied "rigidly" because "ultimately [the] question is whether a tip possessed sufficient indicia of reliability, when considering *the totality of the circumstances*, for [a court] to conclude that the officers possessed an objectively reasonable suspicion sufficient to justify a *Terry* stop." *United States v. Serrano*, 598 F. App'x 72, 75 (3d Cir. 2015) (quoting *Torres*, 534 F.3d at 211) (emphasis in original) (quotations and brackets omitted). "[N]o single factor is dispositive or even necessary to render an informant's tip reliable." *Johnson*,

592 F.3d at 449. Moreover, "[o]ther factors can bolster what would otherwise be an insufficient tip, such as 'the presence of a suspect in a high crime area,' 'a suspect's presence on a street at a late hour,' 'a suspect's nervous, evasive behavior, or flight from police,' and a suspect's behavior 'that conforms to police officers' specialized knowledge of criminal activity.'" *Torres*, 534 F.3d at 211 (quoting *Brown*, 448 F.3d at 251) (brackets omitted).

In effectuating a *Terry* stop, police cannot "seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983). In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500. Thus, a *Terry* stop initially justified by reasonable suspicion may turn into a *de facto* arrest requiring probable cause "if the stop lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (citing *Dunaway v. New York*, 442 U.S. 200, 212 (1979)); *see also Johnson*, 592 F.3d at 447-48 (noting that "[i]n certain circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause").

### 2.    Legality of Defendant Hodge's Detention

The Court first examines whether—at the time of Defendant's initial detention—Agent Fitz and Lieutenant Elskoe possessed sufficient reasonable suspicion to temporarily detain Defendant Hodge. The Court finds that the officers did, in fact, have reasonable suspicion based on reliable information—obtained from both the CS and the officers' personal investigation—that Defendant Hodge was working with the DTO to further its scheme to bring drugs into St. Croix.

The Court first finds that an examination of the five factors set forth in *Johnson* reveal that the information the CS provided "possessed sufficient indicia of reliability" to serve as a basis for the reasonable suspicion necessary to temporarily detain Defendant Hodge. *Torres*, 534 F.3d at 211. The officers had been investigating the DTO for approximately one-and-a-half years, during which time the CS was participating in the DTO as a boat captain. While it is unclear whether the CS provided the relevant information in a "face-to-face interaction" as contemplated by the first *Johnson* factor, the evidence shows that the officers had several conversations with the CS; had installed a GPS tracking device on his boat; and could recognize him by sight. Thus, it is clear that the CS was not truly "anonymous." Rather, as addressed in the second *Johnson* factor, the officers knew the CS to such an extent that he could have been "held responsible if [his] allegations [were] untrue." *Johnson*, 592 F.3d at 449; *see also Torres*, 534 F.3d at 213 (noting that the reliability of a tip from an unnamed 911 caller was supported by the fact that the caller—who was never asked to give his name—reported that he was driving a green taxi from a specified company, and "conclud[ing] that the taxi driver was an innominate (i.e., unidentified) informant who could be found if his tip proved false rather than an anonymous (i.e., unidentifiable) tipster who could lead the police astray without fear of accountability"). Thus, while the officers might not have been able to directly address the CS's credibility in a face-to-face interaction pursuant to the first factor, the second factor strongly supports a finding of reliability.

It is equally clear that the third and fourth factors support a finding of reliability in that the content of the information the CS provided "would not be available to the ordinary observer" and that the CS "recently witnessed the criminal activity at issue." *Johnson*, 592 F.3d at 449. The CS reported that the current "job" was to pick up 80 kilograms of cocaine for co-Defendant Sergio-Quinones and on multiple occasions—as discussed below in the analysis of the fifth factor—

advised the officers when members of the DTO would be heading out to sea to attempt the pickup and which boat they would be using. In short, the CS provided information about the internal plans of the DTO, about which an ordinary observer would not have known. Moreover, the CS often informed police about activities or planned activities of the DTO on the same day that he learned about them. For example, after the CS met with Defendant Hodge and co-Defendant Gamalier Rohlsen-Arizmendi at McDonald's, he informed Agent Santos that he would be leaving in his boat later that day to meet with co-Defendant Rohlsen-Arizmendi and co-Defendant Santiago-Colon on the east end of St. Croix. This shows that the CS had witnessed criminal activity—conspiracy to possess cocaine with intent to distribute—and reported it to law enforcement officials shortly thereafter.

The Court similarly finds that the fifth *Johnson* factor strongly supports a finding of reliability because on numerous occasions the CS predicted future activity that officers were later able to independently verify. *Johnson*, 592 F.3d at 449-50 ("The reliability of an informant's tip can be enhanced further by independent police corroboration of the information provided."). First, on November 9, 2015, the CS informed Officer Santos that members of the DTO were heading out to sea to pick up drugs that day. Officer Santos and others established surveillance and were able to observe the CS's boat heading out to sea as the CS had reported. The next day, on November 10, the CS informed Officer Santos that co-Defendant Santiago-Colon had been brought in to operate the boat and that members of the DTO had gone out earlier but were now returning. Officer Santos established surveillance and observed—as the CS had advised—co-Defendant Santiago-Colon and others returning in the boat. Similarly, the CS accurately advised officers that members of the DTO would make another attempt on November 11 in a different boat; that Defendant Hodge, co-Defendant Gamalier Rohlsen-Arizmendi, and the CS would be meeting on the morning

of November 13 in the McDonald's parking lot; and that later on November 13 he would be taking his boat to the east end of St. Croix to meet with co-Defendant Rohlsen-Arizmendi and co-Defendant Santiago-Colon. The above facts all constitute instances in which the CS reported that certain future events would occur, and officers were able to independently confirm that the CS's predictions were accurate, as contemplated in the fifth *Johnson* factor.

Also significant, officers knew from their prior investigation that the DTO picked up drugs at mid sea about 80-100 miles south of St. Croix from a supply vessel and then returned to St. Croix with the drugs. The officers' observations of the CS's boat on November 13 and the early morning hours of November 14 matched this behavior. In particular, the officers observed the boat heading toward the eastern point of St. Croix, which was consistent with a boat at that location ultimately traveling south of the island. Air surveillance later reported that it observed two boats near each other, and one of the boats was about 60 nautical miles south of St. Croix traveling northward back to St. Croix. Thus, the CS's tip that the DTO was attempting to pick up 80 kilograms of drugs at sea was corroborated by the officers' observations of the boat. This "independent police corroboration" further enhances the reliability of the CS's tips. *See Johnson*, 592 F.3d at 450 (noting that the reliability of a 911 caller's tip was enhanced because police were able to independently corroborate certain details of the information provided and observing that it was "immaterial" that the police "were only able to corroborate innocent details" of the 911 caller's tip).

In sum, examining the five factors set forth in *Johnson*, the Court finds that the information the CS provided "possessed sufficient indicia of reliability" to serve as a basis for the officers' reasonable suspicion of Defendant Hodge. *Torres*, 534 F.3d at 211. Although the information from the CS might not have been provided in a "face-to-face interaction," "no single factor is dispositive

16

or even necessary to render an informant's tip reliable." *Johnson*, 592 F.3d at 449. In view of the CS's basis for knowledge of the DTO's plans, the officers' various communications with the CS, and the fact that the officers were able to independently verify the accuracy of the CS's information on several occasions, this provided more than sufficient indicia of reliability, notwithstanding that the officers did not receive the information in a face-to-face interaction. *Torres*, 534 F.3d at 213 ("a deficiency in one factor may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability" (quoting *Illinois v. Gates*, 462 U.S. 213, 233 (1983))) (brackets and quotations omitted).

Accordingly, in the early morning of November 14, the officers had reliable information from the CS that members of the DTO, including Defendant Hodge, were attempting to bring 80 kilograms of cocaine into St. Croix using the CS's boat. On November 13, the officers had observed the CS's boat leaving St. Croix and (with the aid of air surveillance and a GPS tracking device located in the CS's boat) knew that it had traveled in a manner consistent with obtaining drugs from the supply vessel. Based on the GPS tracking device, the officers further knew that the CS's boat was close to returning to St. Croix and, specifically, was in between Knight's Bay and Cramer's Park. It is with this information that Lieutenant Elskoe drove to Knight's Bay in an attempt to intercept the drugs.[5] Lieutenant Elskoe testified that once he arrived at Knight's Bay he

---

[5] Under the collective knowledge doctrine, the Court's analysis of facts supporting reasonable suspicion is not limited to what Lieutenant Elskoe knew but, also properly includes the facts known by other officers—such as Officer Santos. *United States v. Fernandez*, 652 F. App'x 110, 114 (3d Cir. 2016) (noting that under the collective knowledge doctrine, "the knowledge of one law enforcement officer is imputed to the officer who actually conducted the arrest" (quoting *United States v. Whitfield*, 634 F.3d 741, 745-46 (3d Cir. 2010))) (quotations and ellipses omitted). However, even if the collective knowledge doctrine is somehow inapplicable under the circumstances, the Court finds that Lieutenant Elskoe's personal knowledge on that night provided sufficient reasonable suspicion for Defendant's temporary detention. Lieutenant Elskoe testified that he had learned that several individuals, including Defendant Hodge, would be receiving the shipment of drugs into St. Croix via the CS's boat; that he knew the GPS tracker was indicating

"immediately" recognized Defendant Hodge sitting in the van by himself and that, based on his experience, he found this activity—sitting in a van by oneself in the early morning hours at an otherwise deserted beach—was unusual. This unusual behavior, together with the information Lieutenant Elskoe already knew about Defendant Hodge and the ongoing attempt to bring 80 kilograms of cocaine into St. Croix, provided Lieutenant Elskoe with the necessary "particularized and objective basis for suspecting" that Defendant Hodge was engaged in criminal activity. *Brown*, 448 F.3d at 246 (quoting *Cortez*, 449 U.S. at 417). Thus, the temporary seizure of Defendant Hodge was permissible.

Defendant argues that there was no evidence presented at the suppression hearing showing that at the time of Defendant's seizure the officers had information that Defendant had committed a crime or was about to commit a crime. (Dkt. No. 372 at 2). Defendant contends that at the time of his initial detention, he "was in a vehicle parked on the beach in a lawful manner" and that "[a]lthough all of the law enforcement officers who testified related having received information from a confidential informant regarding the importation of drugs from a foreign vessel, there was not one scintilla of evidence that [Defendant Hodge] was expected to take part in that importation." (*Id.* at 1, 2). Defendant similarly asserts that he "had not been identified as an individual who was bringing drugs into St. Croix on November 14, 2015, nor was he wearing wet clothing and/or carrying suitcases or other bags that may have contained drugs at the time he was unlawfully confined." (*Id.* at 4). The Court disagrees with Defendant's characterization of the evidence and the standard necessary for reasonable suspicion.

---

that the CS's boat might make landfall on the east end of St. Croix (where Knight's Bay is located); that he "immediately" recognized Defendant Hodge; and that he found it unusual that someone would be sitting in a van on the beach by himself in the early morning hours.

The Court notes that—contrary to Defendant's assertions—there is ample evidence in the record tying Defendant Hodge to the DTO's efforts to receive a shipment of cocaine. Lieutenant Elskoe testified that officers had information that several individuals, including Defendant Hodge, would be receiving a shipment of drugs into St. Croix via the CS's boat; Officer Santos testified that the CS had advised officers that the original plan was for members of the DTO to go out on November 8 to pick up the cocaine and then deliver it to a beach on St. Croix where Defendant Hodge and others would take the drugs to a stash house; on November 11, the CS informed Officer Santos that the DTO members were planning on using a different boat for the operation and that he needed to meet with Defendant Hodge later to give him suitcases and additional fuel tanks; and officers observed Defendant Hodge, co-Defendant Gamalier Rohlsen-Arizmendi, and the CS meeting on the morning of November 13 in the McDonald's parking lot, after which meeting the CS reported that he was to take his boat to the east end to meet other individuals of the DTO.

The above uncontested evidence shows that Defendant Hodge was identified as an individual who was working closely with members of the DTO to carry out the suspected shipment of cocaine. While Defendant Hodge was not expected to be on the boat bringing the drugs to St. Croix, he was expected to receive the drugs once they arrived and transport them to a stash house. Finally, the fact that Defendant Hodge met with co-Defendant Rohlsen-Arizmendi and the CS at McDonald's on the morning of the day that CS's boat left with co-Defendant Rohlsen-Arizmendi to retrieve the drugs, supports the inference that Defendant Hodge was still involved in the November 13-14 attempt and would be receiving the drugs once they arrived. Given the totality of the circumstances, Defendant's argument that no reasonable suspicion existed because Defendant was not wearing wet clothing, carrying suitcases, or because there was no testimony that the officers were looking for Defendant Hodge on November 14 is unconvincing.

19

In concluding that the officers had sufficient reasonable suspicion to detain Defendant, the Court finds the Third Circuit decision in *United States v. Goodrich*, 450 F.3d 552 (3d Cir. 2006) to be instructive. In *Goodrich*, police received a call at approximately 11:20 p.m. that a possible theft of a chemical ingredient was in progress. 450 F.3d at 554. The caller stated that "there [were] two people just carrying some kind of buckets or something" and they are "over behind R & M Gas right now loading into some kind of a vehicle." *Id.* Police arrived in the vicinity of the R & M gas station approximately seven minutes later and saw one vehicle about a block or two away. *Id.* Based on the information received in the tip, the officers stopped the vehicle and ultimately discovered evidence tying the occupants to the reported theft. *Id.* at 556. Although the vehicle was not doing anything illegal at the time it was stopped and the police had no description of the vehicle, the Third Circuit held that the stop was supported by reasonable suspicion. In so holding, the Court noted that the events took place in a high-crime area; the investigatory stop occurred late at night; the stop took place in close geographical and temporal proximity to the suspected theft; and there were no other occupied vehicles in the area. *Id.* at 561; *see also United States v. Sewell*, 381 F. App'x 159, 161 (3d Cir. 2010) (finding that reasonable suspicion was established where late at night an officer observed the defendant jogging away from the location of recently reported gunfire and then begin acting nervously when he noticed the police car).

Here, Defendant's investigatory detention occurred in the early morning hours of November 14. Further, the GPS tracking device indicated that Defendant Hodge was in close geographical and temporal proximity to the CS's boat, which officers reasonably suspected was trying to deliver a large shipment of cocaine. Moreover, Lieutenant Elskoe testified that—except for Defendant Hodge sitting in his van—there were no other vehicles in the immediate vicinity, no other people in the van, and no other people around the van. In short, Defendant Hodge appeared

20

to be sitting in his van by himself in the early morning, at an otherwise deserted beach, where officers suspected the DTO might soon be making landfall with a large shipment of cocaine. Taken together with the fact that Lieutenant Elskoe immediately recognized Defendant Hodge and was aware of his connection to the DTO, the Court finds that—as in *Goodrich*—there was sufficient reasonable suspicion to warrant an investigatory seizure.

Defendant also argues that his "involuntary detention . . . exceeded the limited restraint permitted by *Terry v. Ohio*, which rendered [Defendant Hodge's] waiver of his rights verbal or written, invalid because it was tainted by the unlawful confinement of [Defendant Hodge]." (Dkt. No. 372 at 3). Defendant analogizes his initial detention with the facts of *Florida v. Royer*, 460 U.S. 491 (1983) in which the Supreme Court held that what began as a permissible investigatory seizure of a suspected drug courier in an airport became an arrest unsupported by probable cause. *Royer*, 460 U.S. at 502-03. In *Royer*, two officers stopped the defendant before he boarded his flight, asked about the discrepancy in the name shown on his identification and the name under which he had purchased the ticket. *Id.* Unsatisfied with the answer, the officers kept the defendant's identification and ticket, seized his checked bags without consent, and escorted him to a police room ("a large closet") where they continued questioning the defendant, told him they suspected him of carrying narcotics, and asked to open his bags. *Id.* In holding that the officers' conduct was "more intrusive than necessary to effectuate an investigative detention," the Supreme Court noted that there were no "legitimate law enforcement purposes" which were furthered by sequestering the defendant in the police room prior to the officers' attempt to gain his consent to search his bags. *Id.* at 504-05.

The Court is not persuaded by Defendant's argument that—as in *Royer*—his initial detention "exceeded the limited restraint" permitted by a *Terry* stop, because the Court finds that

the circumstances in *Royer* are distinguishable from the circumstances of Defendant's initial detention. In *Royer*, the detention occurred in a public airport, and the Supreme Court could find no legitimate purpose for transporting the defendant to a secluded police room to seek his consent to open his bags. *Id.* In contrast, Defendant Hodge was detained in the early morning hours at an apparently deserted beach, where the officers suspected that other members of the DTO—of which Defendant was a member—might be arriving with a large shipment of cocaine. Given the dangerous circumstances, it was entirely reasonable for the officers to order Defendant out of his van and handcuff him. *See Navarrete-Barron*, 192 F.3d at 791 (noting that "drug trafficking . . . [is] very often is accompanied by dangerous weapons"); *United States v. Garcia*, 2007 WL 2825724, at *4 (E.D. Pa. Sept. 20, 2007) (finding that possession with intent to distribute a large quantity of cocaine is "an inherently dangerous activity"). Moreover, unlike *Royer*, there is no indication that Defendant was transported anywhere or even ordered to sit in a police car until the officers discovered the cocaine and arrested him. Indeed, Officer Santos testified that when he arrived at the scene, he observed Defendant Hodge standing next to Agent Fritz by the van.

The Court fails to see—and Defendant does not explicitly identify—how ordering Defendant out of his van and handcuffing him while the officers conducted their investigation of the beach "exceeded the limited restraint" permitted by *Terry* such that Defendant's initial seizure amounted to a *de facto* arrest. In *Johnson*, the Third Circuit observed the following:

> We have recognized that "the vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (collecting cases). Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into a full-blown arrest.

592 F.3d at 448. The Third Circuit in *Johnson* went on to hold that no *de facto* arrest occurred where the police encircled a car, drew their weapons, yelled at the occupants, and handcuffed the

suspect. *Id.* Here, there is no indication that the officers drew their weapons or used any other physical force besides handcuffs to detain Defendant. Under the circumstances, the officers' actions of ordering Defendant out of the van and handcuffing him while they investigated the beach did not amount to a *de facto* arrest, and Defendant's arguments to the contrary are without merit. *Cf. United States v. Fields*, 449 F. App'x 146, 148-49 (3d Cir. 2011) (holding that no *de facto* arrest occurred when officers shocked the defendant twice with a taser, handcuffed him, and removed him from the area before returning and finding a gun, in part because the officers felt threatened and less aggressive means to detain the defendant had been unsuccessful).

In contrast to Defendant's assertions otherwise, the Court finds that "the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Johnson*, 592 F.3d at 452 (quoting *Terry*, 392 U.S. at 19-20). As explained above, the dangerous circumstances surrounding Defendant's initial detention warranted the use of handcuffs. *See Navarrete-Barron*, 192 F.3d at 791 (holding that "[i]n light of the dangerous nature of the suspected crime of drug trafficking and the good possibility that the driver or passenger had a weapon, the defendant's confinement with handcuffs in the back of a police car during the search of the truck was reasonably necessary to maintain the status quo, protect the officers, and allow them to conduct the search of the truck immediately and without interference"). The Court concludes that, under the circumstances here, ordering Defendant out of his van and handcuffing him while the officers continued investigating the beach was what was "reasonably necessary to protect [the officers'] personal safety and to maintain the status quo during the course of the stop." *See United States v. Holyfield*, 267 F. App'x 130, 135 (3d Cir. 2008) (noting that during a *Terry* stop, "police officers may take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop" (quoting

23

*Edwards*, 53 F.3d at 618) (internal quotation marks omitted)). Additionally, there is no indication in the record—and Defendant does not argue—that the officers acted unreasonably in conducting the investigation such that Defendant was detained longer than necessary. Once Defendant was handcuffed, officers went to investigate the beach where they discovered the cocaine, and the reasonable suspicion ripened into probable cause justifying Defendant's arrest.[6]

In sum, the Court concludes that—based on the reliable information they received from the CS and their own investigation—the officers had sufficient reasonable suspicion to temporarily detain Defendant when they met him on the beach. Moreover, given the totality of the circumstances surrounding the initial detention, the Court finds that Defendant was not subject to a *de facto* arrest when the officers ordered him out of his van and handcuffed him while they continued investigating the beach. Rather, the manner in which Defendant was detained was reasonably related in scope to the circumstances that justified the detention.[7]

---

[6] Defendant does not assert that the officers lacked probable cause to arrest Defendant after the discovery of the cocaine. Rather, Defendant argues that "but for the illegal confinement of [Defendant], there would have been no discovery of the cocaine." (Dkt. No. 372). However, because the Court finds that Defendant's initial seizure was lawful, Defendant's argument that the cocaine must be suppressed fails. Once Officer Santos opened the suitcases and discovered the cocaine, there was "reasonably trustworthy information or circumstances within [Officer Santos's] knowledge [that were] sufficient to warrant a person of reasonable caution to conclude that an offense ha[d] been committed by [Defendant Hodge]." *United States v. Brown*, 565 F. App'x 98, 101 (3d Cir. 2014) (quoting *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002)) (quotations omitted). Thus, Defendant's arrest was supported by probable cause.

[7] Defendant also seeks suppression of "the physical evidence obtained from his person and from the vehicle." (Dkt. No. 180 at 5). The only physical evidence connected to Defendant's arrest that the Government advised the Court of in the suppression hearing is the cocaine, and two satellite phones and a detached battery, that the officers found on the beach. As with the cocaine, the only argument Defendant advances for suppressing the two satellite phones and the detached battery is the alleged illegality of Defendant's initial stop. However, because the Court finds that Defendant was lawfully detained and arrested, the Court rejects Defendant's argument that the two satellite phones and detached battery must be suppressed.

**B.       Defendant's Statements**

After Defendant was detained, he made a statement to Agent Fritz while at the beach. Later, after his arrest, Defendant made additional statements during an interview at the HIDTA office. Defendant argues that these statements should be suppressed because they were obtained in violation of his *Miranda* rights. (Dkt. No. 180 at 7).[8] The Government contends that the statement Defendant made at the beach was not subject to the requirements of *Miranda*, and that Defendant made the statements at the HIDTA office pursuant to a valid waiver of this *Miranda* rights. The Court concludes that none of Defendant's statements were obtained in violation of *Miranda*, and thus, are not subject to suppression on those grounds.

**1.       Applicable Legal Standards**

*Miranda v. Arizona*, 384 U.S. 436 (1966) held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion) (internal citations omitted). A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (quotations omitted). Additionally, "the relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in

---

[8] Additionally, Defendant argues that the statement should be suppressed because Defendant was illegally seized and arrested. (Dkt. No. 180 at 5). However, in light of the Court's finding that Defendant was lawfully seized and arrested, this argument fails.

*Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012)) (quotations omitted). "This determination is objective, based on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

A person may, however, "waive effectuation of these [*Miranda*] rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *see also United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). "Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he . . . validly waived those rights." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000); *see also Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

To prove a valid waiver, the Government has the burden of establishing that the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Pruden*, 398 F.3d at 246 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)) (quotations omitted); *see also United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012).

To determine whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived, courts must "consider the totality of circumstances surrounding [the defendant's] statement." *Briscoe*, 69 F. Supp. 2d at 741 (quoting *United States v. Tyler*, 164 F.3d 150, 158 (3d Cir. 1998)) (quotations omitted). Courts also must consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *Id.* (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)) (internal citations omitted). Examples of "traditional" indicia of coercion are the duration and conditions of detention, the attitude of the interrogators, the defendant's physical and mental state, and other pressures affecting the defendant's powers of resistance and self-control. *Id.* at 741 n.1. "*Miranda* rights will be deemed waived only where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension." *United States v. Sriyuth*, 98 F.3d 739, 749 (3d Cir. 1996) (quoting *Alston v. Redman*, 34 F.3d 1237, 1253 (3d Cir. 1994)) (quotations and brackets omitted).

## 2.    Defendant's Un-*Mirandized* Statement

The Court first examines the exchange at the beach between Defendant and Agent Fritz in which Agent Fritz told him "this looks like a bad day for you," and Defendant responded, "and it looks like it's a good day for you." Although there is no indication that Defendant was advised of his *Miranda* rights prior to making this statement, the Court concludes that this statement was a "spontaneous utterance" and, therefore, is not subject to the dictates of *Miranda*.

Spontaneous statements made without prompting are not implicated by *Miranda* because they are not a product of custodial interrogation. *See United States v. Young*, 233 F. App'x 114, 115 (3d Cir. 2007) (holding that a suspect's incriminating statements made immediately after police informed him of the crimes he was being charged with were spontaneous and not a result of custodial interrogation) (citing *McGowan v. Miller*, 109 F.3d 1168, 1170-71, 1175 (7th Cir.

1997); *United States v. Taylor*, 985 F.2d 3, 6-8 (1st Cir. 1993); *United States v. Jackson*, 863 F.2d 1168, 1172 (4th Cir. 1989)). Here, the central issue is whether, given the circumstances, Agent Fritz's statement to Defendant that "this looks like a bad day for you," was an interrogation such that Agent Fritz should have known that his statement was "reasonably likely to elicit an incriminating response from [Defendant]." *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006) (noting that "the term 'interrogation' under *Miranda* refers to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" (quoting *Innis*, 446 U.S. at 301 n.5) (ellipsis and quotations omitted)). The Court concludes that Agent Fritz's statement was not an interrogation.

Importantly, the Court notes that Agent Fritz's statement to Defendant that "this looks like a bad day for you," was not a question, but was a declaratory statement. Also, there is no indication in the record that Agent Fritz's statement was proceeded by or part of a larger dialogue designed to illicit an incriminating response, or that the statement was anything other than an offhand quip. As noted by the Third Circuit, "[p]olice may not . . . 'be held accountable for the unforeseeable results of their words or actions[,]' and to constitute an interrogation their conduct 'must reflect a measure of compulsion above and beyond that inherent in custody itself.'" *Brownlee*, 454 F.3d at 146 (quoting *Innis*, 446 U.S. at 300, 302) (internal citation omitted).

In finding that Agent Fritz's statement to Defendant was not an interrogation, the Court finds the case of *United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993) to be instructive. In *Benton*, police were informed of a robbery, and Officer Patterson, who was familiar with the suspected robber, began traveling to the scene. *Id.* at 643. While driving to the scene, Officer Patterson observed the suspected robber (the defendant) bend down along a wooden door before

standing up and walking in the opposite direction. *Id.* Soon thereafter, the defendant was handcuffed and put into the back of Officer Patterson's patrol car. *Id.* During this process, the defendant asked what was happening and Officer Patterson told him that they had received a report that he had robbed somebody with a gun. *Id.* Officer Patterson then went to the wooden door and discovered a firearm. *Id.* Once Officer Patterson returned to the patrol car, the defendant again asked what was happening. *Id.* Officer Patterson told him that he was going to be charged and that he had seen the defendant bending over, to which the defendant responded that "no one had seen him throw away the gun." *Id.*

The district court in *Benton* suppressed the defendant's statement reasoning that it was "unnecessary" for Officer Patterson to tell the defendant that he had seen him bending over and that his statement was not a response to the defendant's question but "was a declaration to [the defendant] that the police had evidence 'linking him to the gun' which was likely to elicit a response from [the defendant] protesting innocence or admitting guilt." *Id.* at 644. On appeal, the Third Circuit reversed the district court's decision and concluded that—even disregarding the defendant's earlier question—the police did not conduct an interrogation or its functional equivalent. *Id.* In so holding, the Third Circuit reasoned:

> [I]t would be unreasonable to conclude that the police intentionally created circumstances likely to elicit a statement from [the defendant]. Patterson did nothing more than tell [the defendant] why he was being arrested. While we do not doubt that he lawfully could have told [the defendant] the charge against him and have said nothing more, we do not think that Patterson's act of describing an observation he made prior to the arrest constituted the functional equivalent of a custodial interrogation. Rather, this was a case in which [the defendant's] remarks were unforeseeable.

*Id.*

The Court finds Agent Fritz's statement to Defendant to be analogous to the statement Officer Patterson made in *Benton*. At most, Agent Fritz's quip that "this looks like a bad day for

you," is a declaration indicating that the police had finally "caught" Defendant Hodge and that he would soon have to face the consequences for his actions. While this statement was "unnecessary," as in *Benton*, "it would be unreasonable to conclude that the police intentionally created circumstances likely to elicit a statement." *Id.*; *see also United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) (holding that officer's statement to the defendant that "agents had seized approximately 600 pounds of cocaine and that [he] was in serious trouble" was not an interrogation or its functional equivalent); *cf. United States v. Tiggett*, 219 F. App'x 163, 165 n.2 (3d Cir. 2007) (observing that an officer conducted the functional equivalent of an interrogation by advising an individual detained in holding cell that they had found cocaine in his luggage and suggesting—after the defendant had invoked his right to remain silent—that he could "help himself out"). Accordingly, the Court finds that Agent Fritz's statement was not "reasonably likely to elicit an incriminating response from [Defendant]" and, therefore, Defendant's response "and it looks like it's a good day for you" was not the result of a custodial interrogation. *See Brownlee*, 454 F.3d 146. Because Defendant's response was not obtained in violation of *Miranda* it is not subject to suppression.[9]

### 3.    Defendant's Wavier of His *Miranda* Rights

The Court next examines whether Defendant "voluntarily, knowingly and intelligently" waived his *Miranda* rights prior to making statements during his interview at the HIDTA office. *Miranda*, 384 U.S. at 444. Defendant concedes that he was presented with and signed a *Miranda*

---

[9] The Government argues in the alternative that Defendant was not in custody for *Miranda* purposes when he stated "and it looks like it's a good day for you." (*See* Dkt. No. 343 at 3). However, because the Court finds that there was no interrogation, it declines to examine whether Defendant was in custody for purposes of *Miranda* when he made the statement. The dictates of *Miranda* are triggered only when a person is "in custody" *and* "subjected to either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300-01.

Advice of Rights form before he made statements during this interview but argues that this purported waiver of his *Miranda* rights was not made voluntarily, knowingly, and intelligently. (*See* Dkt. No. 180 at 7-8). The Court disagrees and finds that Defendant's waiver of his *Miranda* rights was valid.

As noted above, to prove a valid waiver, the Government has the burden of establishing by a preponderance of the evidence that the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Pruden*, 398 F.3d at 246 (quoting *Moran*, 475 U.S. at 421) (quotations omitted). The Court finds that there is more than ample evidence in the record to support the conclusion that, under the totality of the circumstances, Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights before his interview at the HIDTA office on November 14, 2015.

The record reflects that the Government introduced into evidence an Advice of Rights form that contains Defendant Hodge's signature under the paragraph reading "someone has read to me this advice of rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer questions without a lawyer present." (Govt. Exh. 2). There is also uncontested evidence from Agent Gardner and Agent Latchmen, both of whom were present for the interview, that Agent Latchmen read the Advice of Rights form to Defendant, asked Defendant if he understood the rights, and Defendant responded in the affirmative. The agents also testified that they observed Defendant sign the Advice of Rights form after Agent Latchmen read it to him. Agent Gardner testified that while Agent Latchmen was reading the *Miranda* rights to Defendant, he was looking at Agent Latchmen and appeared to be listening.

31

Moreover, Agent Latchmen and Agent Gardner testified that Defendant appeared to be relaxed, calm, and cooperative during the interview. The interview, which lasted about 30-45 minutes, was conducted in a conversational tone of voice. Defendant was responsive to Agent Latchmen's questions and gave short, matter of fact answers. The room in which the interview was conducted had several windows and a bathroom. There was water and coffee available and, although Defendant did not request food or water, Defendant was offered a drink at one-point. The interview occurred around 3:30 a.m., but it was commenced within just 30-45 minutes after Defendant arrived from the beach where he had been arrested earlier that morning. Although Defendant was handcuffed during the interview and there were three officers present (one of whom was armed), Agent Gardner testified that no guns were drawn during the interview. Defendant never asked to stop the interview or to have an attorney present.

These uncontested facts establish ample evidence that Defendant's waiver of his *Miranda* rights was made voluntarily, knowingly, and intelligently. *See Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010) (holding that "[t]here was more than enough evidence in the record to conclude that [the defendant] understood his *Miranda* rights" where the defendant received a written copy of the *Miranda* warnings; the officer determined that he could read and understand English; the defendant was given time to read the rights; and the officer read the warnings aloud); *Whiteford*, 676 F.3d at 362 (noting that "[the defendant's] signing of the 'Advice of Rights' form satisfies [the voluntarily, knowingly, and intelligently standard]. He was not intimidated nor coerced, and his level of education would have enabled him to read the form and comprehend its meaning").

Defendant posits a number of reasons why the waiver of his *Miranda* rights was not made knowingly and intelligently, none of which are availing. First, Defendant notes that the Advice of Rights form was in English and none of the agents present during the interview spoke Spanish—

32

even though Defendant's native language is Spanish. (Dkt. No. 344 at 1-3).[10] Moreover, Defendant argues that as a "non-native U.S. citizen[]," "the bedrock concepts of the U.S. criminal justice system such as . . . *Miranda* rights" are foreign to him and that neither Agent Latchmen nor Agent Gardner were aware that Defendant had any prior criminal convictions. (*Id.* at 3-4). Defendant goes on to assert that the evidence demonstrates his "inability to either read, or to comprehend, an Advice of Rights form" because no one during the interview asked whether he could read or write; there was no evidence regarding his educational background; and he asked Agent Latchmen to read the Advice of Rights form to him. (*Id.*). Even taking all of Defendant's assertions as true, the Court finds that Defendant's arguments cannot overcome the weight of evidence that the Government put forth establishing that Defendant's waiver was made voluntarily, knowingly, and intelligently.

As indicated above, when determining whether a waiver was made voluntarily, knowingly, and intelligently, courts must "consider the totality of the circumstances surrounding the interrogation, which includes examining the events that occurred and the background, experience, and conduct of the defendant." *Sriyuth*, 98 F.3d at 749. As to Defendant's claim that he should have been advised of these rights in his native language, the Third Circuit has recognized that "[a] language barrier may be a valid factor to consider in examining the validity of a waiver." *United States v. Caraballo*, 643 F. App'x 163, 169 (3d Cir. 2016), *cert. denied*, 2016 WL 3091951 (U.S. Oct. 3, 2016) (citing *Sriyuth*, 98 F.3d at 749). However, the Court finds that the record established at the hearing is replete with evidence showing that Defendant can understand spoken English.

---

[10] The Court notes that there was no evidence presented at the suppression hearing establishing that Defendant's native language is Spanish. For the purpose of the instant analysis, however, the Court will assume that the representations made by Defendant's counsel in this regard are accurate. (*See* Dkt. No. 344 at 1).

During the November 14 interview, which was conducted in English, there was nothing Defendant said or did that caused Agent Latchmen to question whether Defendant was understanding his questions. Moreover, Agent Latchmen and Officer Santos both testified that on prior occasions they had conversed with Defendant in English, and Officer Santos stated that he had heard recorded telephone conversations between Defendant and the CS that were in English. Officer Santos also testified that on November 16, 2015, he sat in on another interview with Defendant and federal agents to serve as a translator but observed that no translation was necessary as everyone—including Defendant—was conversing in English.

The Court finds the instant facts similar to *United States v. Caraballo*, 643 F. App'x 163 (3d Cir. 2016). In *Caraballo*, the defendant, whose first language was Spanish, argued that he did not understand the *Miranda* warnings because they were given to him in English. *Id.* at 169. The court in *Caraballo* upheld the district court's finding that the defendant's waiver "was uncoerced and made with requisite awareness of the right being abandoned." *Id.* The court noted the following facts in support of its holding:

> [The defendant] spoke with Officer White in English throughout the traffic stop, never indicated to Officer White that he did not understand English or that he did not understand the *Miranda* warnings, and admitted to the District Court that he told Officer White that he did understand the warnings.

*Id.*

Here, as in *Caraballo*, there is no evidence that Defendant gave any indication during the November 14 interview that he had difficulty understanding English, that he wanted his *Miranda* rights read to him in Spanish, or that he did not understand the *Miranda* rights. Rather, the record shows that Defendant signed the Advice of Rights form stating that he understood what his rights were; verbally acknowledged that he understood his rights; and directly answered Agent Latchmen's questions in such a way that Agent Latchmen never doubted that Defendant

34

understood English. While there is no evidence that Defendant could read English, this fact is of little import as Defendant Latchmen read Defendant his *Miranda* rights aloud and, when asked, Defendant responded that he understood them. *See United States v. Velasquez*, 626 F.2d 314, 319 (3d Cir. 1980) (upholding the district court's finding that the defendant waived her *Miranda* rights where she was "read her *Miranda* rights from a standard form . . . indicated that she understood her rights . . . and proceeded to make certain statements," even though she did not sign a waiver). Thus, looking at the totality of the circumstances, the Court finds no basis for concluding that Defendant could not understand his *Miranda* rights because they were read to him in English, and, accordingly, the fact that Defendant might not have been able to read English is of no significance.

The Court reaches a similar conclusion regarding Defendant's other arguments that he is a non-native U.S. citizen with no prior convictions, who is unfamiliar with the U.S. criminal justice system, and that there was no evidence of his educational background. While these points are all relevant in the Court's analysis of the totality of the circumstances, they are not enough to overcome the weight of the evidence recounted above. Even assuming Defendant was unfamiliar with *Miranda* rights or the U.S. criminal justice system in general, he was clearly informed of his *Miranda* rights before the November 14 interview and indicated that he understood them. Likewise, although it is unclear what formal education Defendant received, there is no indication that he is of below-average intelligence. Defendant had no trouble responding to Agent Latchmen's questions, and—based on the information provided by the CS—he helped coordinate a relatively complex drug trafficking operation.

In sum, the Court finds that, based on the totality of the circumstances, Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights prior to the November 14 interview.[11]

## C.      Defendant's Statements During the November 16 Interview

In his Motion to Suppress, Defendant also argues that his statements he made during a November 16, 2016, interview should also be suppressed. At the suppression hearing, the Government put forth no evidence regarding the November 16 interview and failed to even identify what statements were made on November 16. In response to inquiry from the Court, the Government asserted that it did not plan to use any of Defendant's November 16 statements in its case in chief, although it may seek to introduce them for impeachment purposes in its rebuttal case. At the suppression hearing, the Court ordered the Government to submit supplemental briefing addressing its position that it could use Defendant's November 16 statements in its rebuttal case.

In the supplemental briefing ordered by the Court, the Government asserts that during the November 16 interview, Defendant stated, *inter alia*, that "he was paid $3,000 to watch the beach; he was behind in his rent; and he dropped his phone at Knight's beach because he was scared." (Dkt. No. 343 at 4). The Government concedes in its brief that, if the November 16 statements

---

[11] In so finding, the Court also rejects Defendant's argument that his statements made during the November 14 interview were made involuntarily. (*See* Dkt. No. 180 at 8). "[A] statement is involuntary when the suspect's will was overborne in such a way as to render his confession the product of coercion." *United States v. Latz*, 162 F. App'x 113, 118 (3d Cir. 2005) (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002)) (quotations omitted). "A necessary predicate to a finding of involuntariness is coercive police activity. Further, there must be some causal connection between the police conduct and the confession." *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (internal citation omitted). Here, the evidence in the record establishes that there was no police coercion such that Defendant's will could have been overborne. Most notably, the interview only lasted 30-45 minutes; Defendant appeared to be relaxed, calm, and cooperative during the interview; no weapons were drawn; and before the interview commenced the officers advised Defendant of his *Miranda* rights and provided him the opportunity to have the interview recorded.

were involuntary, then the statements could not be introduced even for impeachment purposes. Rather than hold another evidentiary hearing to determine whether the November 16 statements were involuntary, "the Government states that it will not introduce the November 16th statement for any purpose." (*Id.* at 4).

In Defendant's Reply to the Government's Supplemental Response, Defendant asserts that "an Order directing that the Government cannot use the November 16, 2015, statement in its case in chief is appropriate." (Dkt. No. 372 at 4). Defendant grounds his position on the fact that "[t]he Government did not put forward any witness or arguments regarding [Defendant's] motion to suppress the November 16, 2015, statement made prior to this first presentment in Court." (*Id.*).

Based on the Government's representation that it will not use the November 16 statements for any purpose, the Court finds that the issue of whether the November 16 statements must be suppressed is moot.

## III.    CONCLUSION

For the reasons stated above, the Court will deny on the merits Defendant's Motion to Suppress Statements and Physical Evidence, except in regards to the statements Defendant made during the November 16, 2015 interview. As to the November 16 statements, the Court will deny Defendant's Motion to Suppress as moot. An appropriate Order accompanies this Memorandum Opinion.

Date: February 24, 2017                               _____/s/_____
                                                      WILMA A. LEWIS
                                                      Chief Judge